Filed 9/10/14  P. v. Stewart CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>KENNY JOHN STEWART,<br><br>　　　　Defendant and Appellant. | B253961<br><br>(Los Angeles County<br>Super. Ct. No. KA099214) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Kenny John Stewart, appeals from the judgment entered following a jury trial which resulted in his conviction of two counts of unlawful sexual intercourse with a minor who was more than three years younger than Stewart (Pen. Code, § 261.5, subd. (c)),[1] three counts of committing a lewd and lascivious act with a child under the age of 14 years (§ 288, subd. (a)) and possession of matter depicting a minor engaging in sexual conduct (§ 311.11, subd. (a)). The trial court sentenced Stewart to 14 years in prison. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

    a. *The prosecution's case*.

        i. *Unlawful sexual intercourse*.

Seventeen-year-old Maria Doe met Stewart through Facebook when she was 15. Stewart told Maria his name was Damian Shawdo and he was 17 years old. After conversing on Facebook for approximately three weeks, then talking on the telephone, Stewart and Maria met in person. Maria thought Stewart looked older than the 17 years he had represented himself to be and, when they met, he told her he was actually 23.[2] In addition, Stewart did not resemble the photograph he had placed on Facebook. The photograph had been of a young male and Stewart told Maria it was of a friend of his.

The first time Maria met Stewart was in July 2012. She took a bus to Pomona and, after he met her at the bus stop, they walked to the apartment where he was staying. Stewart's children, two boys, one approximately eight years old and the other approximately ten years old, were there. After Maria and Stewart visited for a time, Maria's sister picked her up and took her home.

During July and August 2012, Maria saw Stewart approximately four times. They had sexual intercourse on two occasions. The first time, Stewart, Maria and his boys walked to a nearby McDonald's restaurant. As Stewart's boys ate their food, Stewart

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     Stewart was actually 31 years old.

2

took Maria to the top of a slide in the play area.  There, Stewart helped Maria pull down her shorts and they had sexual intercourse.  Stewart sat on the slide, had Maria get on top of him, then placed his penis in her vagina.  However, when Stewart's boys came running over and told Stewart people were coming toward the slide, Stewart removed his penis from Maria's vagina and he and Maria climbed down from the slide.  Accompanied by his children, Stewart and Maria walked back to Stewart's apartment.  On the way, Stewart told Maria he wanted to take her to a hotel so they could "continue . . . what [they] had been] doing."  Maria, however, told Stewart she had to go home.

Two or three weeks later, in August 2012, Maria again went to Stewart's apartment.  Stewart offered Maria some juice.  After she had taken a few sips, Maria noticed the juice "had something inside of it."  Maria began to feel "really dizzy" and Stewart took her out to the garage, which was filled with furniture.  He had her sit on a couch, sat down next to her then tried to climb on top of her.  Maria could not  remember if she pushed Stewart away or not.  She believed she was not fully conscious and "was not sober."  When Maria asked Stewart, he told her "he had poured something in [her] drink]."

Stewart attempted to remove Maria's clothes, but she felt uncomfortable.  After Stewart took off his pants and shirt, Maria removed her shorts and Stewart began to have sex with her.  While Maria was leaning on the couch, Stewart got on top of her and placed his penis in her vagina.  At first Stewart had acted as though he was putting on a condom.  However after they had sex, Maria looked down and saw the condom on the floor.  When Maria then told Stewart he was hurting her, he said he "didn't care."  He told Maria, "[I]t's supposed to hurt."

On a third occasion when she got together with Stewart, he offered her marijuana.  Although she smoked some with him, they did not have sex.

Maria saw Stewart for the last time on August 28, 2012.  She went to his apartment with her best friend, 15-year-old Guadalupe.  Stewart and his two sons were there.  On that day, police officers arrived and transported both Maria and Stewart to the station.  Maria had been surprised to see the officers and, at first, she told them she and

Stewart were just friends and she denied having had sexual intercourse with him. Maria then learned Stewart was 31-years-old and his real name was not Damian, but Kenny. In addition, when Maria had taken a photograph of Kenny, "[h]e [had] got[ten] mad." He told Maria to delete the picture and when she said she had already sent it to someone, Stewart had told Maria, "Don't test me. You don't know what I'm capable of." Stewart stated he could "just make a call and make [Maria and her] family disappear." Maria then became frightened and decided to be candid with the police about what had happened.

ii. *Committing lewd and lascivious acts with a child.*

In 2011, Tawnya G. and her three children, 16-year-old Josh, 9-year-old Zachary and 8-year-old Makayla, lived at a shelter called the Midnight Mission. Several weeks before she and her children left the Mission and moved into a small apartment in Encino, they met Stewart and his two boys. Although Stewart stayed at the Mission, he and Tawnya G. kept in touch and, at times, he went to her apartment for events such as birthday parties for the children. On one occasion, Stewart and his children stayed for awhile after the party. Stewart offered to make dinner for Tawnya G., Zachary, Makayla and another woman, a friend of Tawnya G.'s named Sheri, Sheri's eight-year-old son, Dante, and her four-year-old daughter, Desiree.

While he was cooking, Stewart realized he needed a particular ingredient for the meal and Tawnya G., accompanied by Sheri and Desiree, went to the market to get it. While they were gone, all of the boys were in the bedroom playing video games. Makayla was in the living room watching television. While Tawnya G., Sheri and Sheri's daughter were at the store, Stewart sexually assaulted Makayla. It was not, however, until several weeks later that Makayla told Tawnya G. about the incident.

When Makayla finally told her mother, she indicated that while Tawnya G., Sheri and Desiree had been at the store, Makayla had been sitting on her mother's bed in the living room making birthday cards. Stewart had approached Makayla, laid down on the bed and repeatedly told her to lie down next to him. Although she did not want to, Makayla finally did so. Makayla lay down on her side, with her back facing Stewart.

4

Stewart, who was facing Makayla's back, pulled up her dress, pulled down her panties and, after then pulling down his own pants and underwear, put his hands on Makayla's hips and placed his erect penis between her buttocks. Later, when they were on the couch, Stewart reached around and "touched [Makayla's] front private part" with his hand.

Makayla wanted to "get away" from Stewart, so she told him she wished to go play with his children. Instead, she got up and went into the bathroom to "check[] [her]self to see if [she] was all right." It was at that time she found a "wet," "slimy" liquid inside her "butt cheeks." Because she was afraid of Stewart and afraid he might come after her, Makayla locked the door and stayed in the bathroom.

Later that night, after Makayla had gone to bed, she heard the bedroom door open. Makayla had gone to bed early and was the only one in the room. Stewart walked in, got into bed with Makayla and, while she was laying on her side facing the wall, he pulled down her pajama bottoms, then pulled down his pants, laid down next to her and sodomized her.

Makayla did not immediately tell her mother what Stewart had done "[b]ecause [Makayla] thought [Stewart] was going to hurt [her]." When Makayla told her mother, Tawnya G. was "furious." The day after Makayla told Tawnya G. what had happened, Tawnya G. took Makayla to the pediatrician. The doctor notified the Department of Children and Family Services of what he had been told and, within a couple of days a social worker came to Tawnya G.'s home. After speaking with the social worker, Tawnya G. spoke with a police officer.

### iii. *Possession of matter depicting minors engaging in sexual conduct.*

Jensine R. was born on October 30, 1995. When she was 13 or 14 years old, Jensine, who is from Minneapolis, Minnesota, set up a Facebook account in order to socialize with friends and others. On her Facebook page, an individual who identified himself as 16-year-old Damian Shawdo began to send Jensine messages. After Jensine and Shawdo had communicated a few times, Shawdo asked Jensine to send him pictures

of herself. Shawdo indicated he wanted pictures of Jensine's "breasts and private parts." Jensine decided to accommodate Shawdo and she sent him the photographs.

After Jensine sent to Shawdo pictures of her breasts, vagina and buttocks, Shawdo responded by making sexual remarks and indicating he wished to see Jensine in person. The two, however, never met.

Jensine did not know anyone named Kenny or Kenneth Stewart. When a police officer from Pomona called Jensine's school, Jensine spoke with the officer and indicated, although she had been somewhat suspicious of Shawdo, she had continued to communicate with him because he knew and spoke with other people in her city and state.

In August 2012, Pomona Police Department Detective Roger Iwig was assigned to the Sex Crimes Division and assisted in the investigation of Stewart's case. After Stewart waived his *Miranda*[3] rights, he indicated he had a Facebook account. After obtaining a search warrant, Iwig went to the Facebook account where he found conversations Stewart had engaged in with young girls across the country, most of which began as "flirtatious in nature and [then] turned sexual." In addition, there were "nude photographs of girls." Many of the photographs were of "female breasts or [close ups of] genitalia[]." The photographs which depicted not only the bodies, but faces as well, appeared to be of "preteen" and teenage girls.

During the investigation, Pomona police officers went to Stewart's apartment, primarily to check on the welfare of his children. When officers arrived, Stewart was standing out in front. One of the officers asked Stewart if there were "two [underage] females in his apartment" and Stewart responded that two 16-year-old girlfriends were there. When one of the officers entered the apartment, he saw "what appeared to be two juvenile females sitting on the couch" and "two young boys in the same room." In plain view, on top of a dresser next to a couch, an officer found a letter addressed to Damian Shawdo.

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

6

b. *Defense evidence*.

In 2012, Los Angeles Police Officer Erik Schick, who was "working [the] Sex Crimes Unit," was assigned to the case involving Makayla Doe. The officer interviewed Makayla at her school on May 9, 2012. Makayla told the officer about three incidents, one of which occurred on the couch. Makayla indicated that, during that incident, Stewart's two sons were also sitting on the couch. A second incident occurred on the bed in the living room. Makayla was on the bed making party invitations when Stewart approached her, laid down next to her and, after removing Makayla's shorts and panties and his own pants, "proceeded to rub his [erect] penis along her buttocks." At that point, Stewart heard a sound and, believing Makayla's mother was returning to the apartment, got up from the bed and returned to the kitchen.

Schick stopped working on the case in August 2012. The officer explained to Makayla's mother that, without additional information, he could not continue the investigation.

2. *Procedural history*.

In a third "amended/consolidated" information filed October 17, 2013, Stewart was charged with two counts of unlawful sexual intercourse (§ 261.5, subd. (c)), a felony (counts 1 and 2); three counts of committing a lewd and lascivious act upon a child under the age of 14 years (§ 288, subd. (a)), a serious felony within the meaning of section 1192.7, subdivision (c) (counts 3, 4, and 5); two counts of sexual intercourse or sodomy with a child 10 years old or younger (§ 288.7, subd. (a)), a serious (§ 1192.7, subd. (c)) and violent (§ 667.5, subd. (c)) felony (counts 6 and 7); and one count of possession of matter depicting a minor engaging in sexual conduct (§ 311.11, subd. (a)), a felony (count 8). It was further alleged as to counts 3, 4, 5, 6, 7 and 8 that any prison time imposed for the offenses was to be served in state prison (§ 1170, subd. (h)(3)).

Following argument by the parties, the trial court denied Stewart's motion to set aside the information pursuant to section 995. The trial court determined the evidence presented at the preliminary hearing had sufficiently established the charges made against Stewart.

7

On October 25, 2013, before trial began, Stewart made a *Marsden*[4] motion. When Stewart indicated he believed his counsel seemed "unprepared" and unwilling to "fight for [him]," the trial court stated Stewart's allegations were "vague" and he needed to tell the court "in particular" what counsel "should be doing that [she was] not." Stewart then indicated that every time his counsel conferred with the district attorney, she informed Stewart the prosecutor appeared to have a favorable case. Stewart believed his counsel was skeptical with regard to his version of the events and had a "negative" attitude. The trial court informed Stewart counsel was most likely simply telling him the truth and what the circumstances appeared to show. For example, several individuals who might have been witnesses in his favor were unavailable as they were children and their parents had denied defense counsel access to them. Only if counsel was being frank with him, could Stewart make appropriate decisions about his case. The trial court then reminded Stewart the People had made him several offers, including one for six years, which he had chosen to reject. When the trial court noted defense counsel was still working with the prosecution to obtain another offer for Stewart, the court indicated it appeared the People "really [were not] interested." The trial court commented: "They think they can put their evidence on and have a conviction. They are pretty confident." The trial court continued: "So, your attorney is fighting to get you another offer . . . . I haven't heard much that she can go on to help you. If the People feel that strongly about their case, [there is] not much she can do . . . ." "[You can put on your case and] [y]ou can testify if you want. And we'll see if the jury buys it. If they don't, then you're . . . facing . . . 64 to life . . . ." After defense counsel indicated the People's final offer had been 25-to-life, the trial court informed Stewart he could either take the offer or go to trial. The court stated: "Once we order a jury panel, I won't accept a plea. It will be plead out to everything or finish trying the case because we don't order 60-plus jurors only to have everybody have a change of heart and try to settle it . . . . So, if you're going to settle it, it will be today. [¶] [Your] [m]otion is denied."

---

[4]     *People v. Marsden* (1970) 2 Cal.3d 118.

After the jury was selected, evidence was presented, arguments were made and the trial court instructed the jury on the law of the case, the jury began its deliberations. During the afternoon session on November 1, 2013, the jury asked the court reporter to read back certain testimony. Stewart, who had not waived his right to hear readback, was present with his counsel. After the testimony had been read back to them, the jurors resumed their deliberations.

Later that afternoon, the jurors indicated they had a question regarding counts 6 and 7. The question read: "[I]f the jury is not unanimous for either guilty or not guilty, do we automatically move to counts 4 and 5? Do we have to be unanimously not guilty on count[s] 6 and 7 in order to move to counts 4 and 5?" The court indicated its response would be for the jury to refer to the instruction numbered 3516.[5] The trial court stated it would inform the jury, "[c]ounts 4 and 6 are separate counts as are 5 and 7. If you are truly hung, meaning you cannot reach a unanimous verdict after full deliberation on count 6, you should still return a verdict on count 4 if you are able. [¶] The same will apply as to count[s] 7 and 5." The court then addressed counsel and stated: "Even if they are hung . . . on 7, the sodomy, they can still return a verdict on lewd act."

Defense counsel then addressed the court and indicated she had advised Stewart "that [her] suspicion was if [the jury was advised] that . . ." Stewart had waived his presence for further readback, it would be less hesitant to ask for the readback of additional testimony. Stewart, however, had "indicated he [wished] to be present for all of it. Even if that mean[t] risking them doing exactly what they just did, and say[ing] they do not need to hear any further [testimony]." The trial court agreed with defense counsel, that by requiring Stewart to be present, it would "hold up the deliberations" and

---

[5]    As read to the jury, CALCRIM No. 3516 stated: "The defendant is charged in Count 5 with Lewd Act upon a child under 14 and in Count 7 with Sodomy with [a] child 10 [years] or younger. You must first decide whether the defendant is guilty of Sodomy, [Count] 7. If you find the defendant guilty of Sodomy, Count 7, you must return the verdict form for Lewd Act, Count 5[,] unsigned. If you find the defendant not guilty of Sodomy, Count 7[,] you must then decide whether the defendant is guilty of Lewd Act, Count 5."

9

the jury did not wish to do that. Defense counsel then indicated she "just want[ed] to put on the record . . . [she] had [so] advised [Stewart] in case there was an issue later on with it."

On the morning of November 4, 2013, the jury indicated it had reached verdicts. The foreperson handed the verdict forms to the court clerk who indicated the jury had found Stewart guilty of two counts of unlawful sexual intercourse in violation of section 261.5, subdivision (c), a felony, as charged in counts 1 and 2 of the third amended information. The jury had also found Stewart guilty of three counts of committing a lewd act upon a child in violation of section 288, subdivision (a), a felony as charged in counts 3, 4 and 5 of the third amended information. Finally, the jury found Stewart guilty of the crime of possession of matter depicting a minor engaging in sexual conduct in violation of section 311.11, subdivision (a), a felony as defined in section 311.4, subdivision (d) and as charged in count 8 of the third amended information. A polling of the jurors indicated each juror had reached the verdicts as read by the court clerk.

After the jurors had been dismissed, counsel, Stewart and the trial court apparently had a discussion regarding the fact "the jury had not ruled on or submitted verdicts for [counts] 6 and 7, one way or the other, either guilty or not guilty [and] that [it is necessary for the court] somehow to enter what the jury did with those counts . . . . [T]he court didn't ask whether or not [the jurors] were hung on 6 and 7 . . . [and] the issue remains as to what [they] intended to do with those counts because they didn't rule . . . ." The trial court then indicated: "I'm thinking that the jury may have been hung and simply moved on to the next counts . . . but we didn't confirm that . . . . The only thing I can think of [is] to bring them back and ask them what they intended to do . . . ; then the court may have enough . . . to rule that they could not reach a verdict and that they were hung on those counts. Or they may say they were confused which creates other issues." The trial court requested both counsel "to research the issue until December 11[, the day set] for sentencing." At that time the parties could decide what to do about those counts. The trial court indicated the jury could be brought back to clarify its thoughts or perhaps

the parties could agree to waive any appellate issue with regard to the verdicts and simply have the counts dismissed.

At proceedings held on December 11, 2013, defense counsel moved for a continuance of sentencing until January 15, 2014. Although the trial court granted the continuance, it allowed one of the victims, Makayla Doe, to present a statement at the December 11 hearing.

Sentencing was held on January 15, 2014. After indicating it had read and considered both defense counsel's and the prosecutor's sentencing memoranda, the trial court selected count 3, committing a lewd act upon a child, as the base term and imposed the upper term of eight years in prison. For Stewart's convictions of counts 1 and 2, unlawful sexual intercourse, the trial court imposed terms of one-third the midterm, or eight months for each count, the terms to run consecutively to the eight years imposed for count 3. For counts 4 and 5, committing lewd and lascivious acts upon a child, the court imposed as to each count one-third the midterm, or two years, the terms to run consecutively to all other terms imposed. As to count 8, possession of material depicting a minor engaging in sexual conduct, the trial court imposed another consecutive term of one-third the midterm, or eight months. At the prosecutor's request, the trial court then dismissed counts 6 and 7, in which it had been alleged Stewart had committed sodomy. Accordingly, in total Stewart was sentenced to 14 years in state prison.

Stewart was awarded presentence custody credit for 369 days actually served and 55 days of good time/work time, or a total of 424 days. He was ordered to pay a $300 restitution fine (§ 1202.4, subd. (b)), a stayed $300 parole revocation restitution fine (§ 1202.45), a $240 court operations assessment (§ 1465.8, subd. (a)(1)), a $180 criminal conviction assessment (Gov. Code, § 70373) and a $400 habitual sexual offender fine, along with a penalty assessment and 20 percent criminal surcharge (§ 290.3).

Stewart filed a timely notice of appeal on January 15, 2014.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the

11

record.  By notice filed June 4, 2014, the clerk of this court advised Stewart to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider.  No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities.  (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


KITCHING, J.


ALDRICH, J.


12